AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
District of New Mexico ☐▼

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
3409 LAFAYETTE DR NE, APT- D, )   Case No. **23 MR 626**
ALBUQUERQUE, NM, 87107 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the _____ District of _____ **NEW MEXICO** _____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. SS 841 | Distribution and possession with intent to distribute controlled substances |
| 21 U.S.C. S 846 | Conspiracy to distribute and possess with intent to distribute controlled substance |

The application is based on these facts:
Please see attached affidavit.
AUSA Tim Vasquez has approved this affidvait.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Task Force Officer Erick D. Castaneda
*Printed name and title*

Sworn telephonically and signed electronically

Date: _____ 03/20/2023 _____

_____
*Judge's signature*

City and state: Albuquerque, NM

United States Magistrate Judge JOHN F. ROBBENHAAR
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | |
| 212 SAN LORENZO AVENUE NW, ALBUQUERQUE NEW MEXICO 87107 ("TARGET LOCATION 1"); | Case No. _____ |
| 3409 LAFAYETTE DRIVE NE, APT-D, ALBUQUERQUE NEW MEXICO 87107 ("TARGET LOCATION 2") | |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Erick D. Castañeda, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises, further described in Attachments A-1 and A-2, for the things described in Attachment B:

a.  212 San Lorenzo Avenue NW, Albuquerque, New Mexico 87107 (hereinafter "TARGET LOCATION 1);

b.  3409 Lafayette Drive NE, Apt-D, Albuquerque, New Mexico 87107 (hereinafter "TARGET LOCATION 2");

2.     I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") and have been since June 2020. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request arrest and search warrants.  Furthermore, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct

investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516.  Prior to being a TFO with the DEA, I worked as a full-time sworn law enforcement officer with the Bernalillo County Sheriff's Office ("BCSO") since June 2015.

3.      In my time as a Sheriff's Deputy and a DEA TFO, I have received training including controlled substance identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical applications of narcotics enforcement, surveillance and electronic monitoring techniques, money laundering investigations and various forensic subjects, including latent fingerprint collection and analysis.

4.      As a certified Sheriff's Deputy and DEA TFO, I have participated in numerous investigations of individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine, fentanyl, and other controlled substances as defined in 21 U.S.C. § 801.  My experience as a TFO includes but is not limited to: conducting surveillance; interviewing witnesses; participating in arrests, searches, and seizures; working in an undercover capacity and working with informants and investigating money laundering cases. I have received training and experience in the investigation of violations of federal and state drug and money laundering laws. I have participated in the investigation of several drug trafficking conspiracies. As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.

5.      I also have experience in analyzing and interpreting drug codes and cryptic dialogues used by drug traffickers in both English and Spanish. The interpretations of words and phrases included below are based upon mine and other agent's training and experience, in addition to the context provided by other calls and supplemental investigation. My translations

and summaries are not necessarily verbatim translations of the pertinent communications regardless of the format used. Several callers who use various and unknown phone numbers have been identified by voice comparison between a known recording of that individual's voice and the voice on the new number. They have been identified by someone who is familiar with the voice and fluent in both Spanish and English.

6.      I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl, by Raymond Nathaniel PARKER and Christopher RODRIGUEZ.  PARKER resides at 212 San Lorenzo Avenue NW, Albuquerque, New Mexico (TARGET LOCATION 1). RODRIGUEZ resides at 3409 Lafayette Drive NE, Albuquerque, New Mexico (TARGET LOCATION 2). [1]  In the course of this investigation, PARKER and RODRIGUEZ have each been in contact with an undercover agent.  Since the investigation's inception, I, as well as Special Agents and other Task Force Officers with the Drug Enforcement Administration, and law enforcement officials from other agencies, have obtained information regarding the illegal drug trafficking activities of PARKER and RODRIGUEZ.

7.      I make this affidavit based upon my own knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including:

   a.      Information provided by TFOs, SAs, and Intelligence Research Specialists (IRS) of the DEA, and other law enforcement officials with BCSO, including oral and written reports that I have received directly or indirectly

---

[1] RODRIGUEZ is currently being held at the Metropolitan Detention Center (MDC) on an open count of murder, child abuse, tampering with evidence and probation violation. The homicide occurred on March 14th, 2023, in Albuquerque, New Mexico.

from said investigators;

    b.     Results of physical surveillance conducted by agents during the investigation;

    c.     A review of telephone toll records and subscriber information;

    d.     A review of driver's license and automobile registration records;

    e.     Records from commercial databases; and

    f.     Records from the National Crime Information Center ("NCIC").

8.     This affidavit is intended only to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

9.     I believe there is probable cause that PARKER, RODRIGUEZ, and their co-conspirators have committed, are committing, and will continue to commit offenses involving violations of, *inter alia*:

    a.     21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances; and

    b.     21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances.

## EVIDENCE SOUGHT DURING SEARCH

10.     Based on my training, experience, and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports, and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so

4

that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging, and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds

11.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

12.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

13.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and

telephone numbers of suppliers, customers, and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

14.     Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

15.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money, and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money, and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings,

6

carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

16.     Other evidence of transportation, ordering, possession, and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

17.     Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

18.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate, and businesses, both real and fictitious. They also try to secret, transfer, and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes, and safety deposit boxes, and/or (d) using the money to buy assets which are

7

difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

19.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

20.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-referenced devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging,

social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

21.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences, or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

22.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses, or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

23.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

24.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

25.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored, or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

26.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and

other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds, and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts, or scanned into digital format and stored on computers and related digital media.

27.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

28.     A list of items agents seek authority to seize is in Attachment B.

**COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

29.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media, and other storage media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all

under Rule 41(e)(2)(B).

30.     *Necessity of seizing or copying entire computers or storage media.*  In most

cases, a thorough search of a premises for information that might be stored on storage media

often requires the seizure of the physical storage media and later off-site review consistent with

the warrant. In lieu of removing storage media from the premises, it is sometimes possible to

make an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

     a.  The time required for an examination. As noted above, not all evidence takes the

          form of documents and files that can be easily viewed on site.  Analyzing

          evidence of how a computer has been used, what it has been used for, and who

          has used it requires considerable time, and taking that much time on premises

          could be unreasonable. Storage media can store a large volume of information.

          Reviewing that information for things described in the warrant can take weeks or

          months, depending on the volume of data stored, and would be impractical and

          invasive to attempt on-site.

     b.  Technical requirements.  Computers can be configured in several different ways,

          featuring a variety of different operating systems, application software, and

          configurations.  Therefore, searching them sometimes requires tools or

          knowledge that might not be present on the search site.  The vast array of

          computer hardware and software available makes it difficult to know before a

search what tools or knowledge will be required to analyze the system and its

data on the Premises. However, taking the storage media off-site and reviewing

it in a controlled environment will allow its examination with the proper tools

and knowledge.

    c.  Variety of forms of electronic media. Records sought under this warrant could

be stored in a variety of storage media formats that may require off-site

reviewing with specialized forensic tools.

31.    *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

computers and/or storage media that reasonably appear to contain some or all of the evidence

described in the warrant, and would authorize a later review of the media or information

consistent with the warrant. The later review may require techniques, including but not limited

to computer-assisted scans of the computer or entire medium, that might expose many parts of a

hard drive to human inspection in order to determine whether it is evidence described by the

warrant.

32.    The warrant I am applying for would permit law enforcement to obtain from

certain individuals the display of physical biometric characteristics (such as fingerprint,

thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure

pursuant to this warrant. I seek this authority based on the following:

    a.  I know from my training and experience, as well as from information found in

publicly available materials published by device manufacturers, that many

electronic devices, particularly newer mobile devices, and laptops, offer their

users the ability to unlock the device through biometric features in lieu of a

13

numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

14

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from

15

other brands carry similar restrictions. Thus, if a locked device is equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

33.    Based on the foregoing, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe Raymond PARKER and/or co-conspirators fingers (including thumbs) to the fingerprint scanner of the Device; (2) hold the Device in front of Raymond PARKER and/or co-conspirators face and activate the facial recognition feature, for the purpose of attempting to unlock the Device in order to search its contents as authorized by this warrant.

16

**PROBABLE CAUSE**

34.     On or about December 2022, Task Force Officers with the DEA met with a

Bernalillo County Sheriff's Office (BCSO) confidential source (hereafter referred to as "CS").[2]

CS informed Agents that the CS was in contact with an individual known to the CS as "Lil

Pantera". The CS advised Agents that "Lil Pantera" sold fentanyl pills in Albuquerque, NM and

stated "Lil Pantera" lived in the area of Menaul/San Pedro. The CS stated "Lil Pantera" carries

firearms while selling drugs and stated he possibly sells firearms as well. Agents showed the CS

a photo of PARKER obtained through a driver's license query, and the CS confirmed that

PARKER was the individual the CS knew and has known as "Lil Pantera". The address on

PARKER's driver's license was listed as 2346 Cardenas Drive NE, Albuquerque, New Mexico,

87110, which is in the area of Menaul/San Pedro.

35.     The CS provided the number for PARKER to Agents. The number provided for

PARKER was (505) 974-9427. Agents subpoenaed subscriber records for (505) 974-9427,

which returned to Jose Roditi at 8516 Harwood Avenue NW, Albuquerque, New Mexico

87111. Agents were not able to find a connection between PARKER and Roditi using Law

Enforcement Databases.

<u>UC-1 Introduction to PARKER and Undercover Purchase #1</u>

36.     On or about February 2023, DEA utilized the CS to introduce a DEA UC,

(hereafter "UC-1") to PARKER.  The CS contacted PARKER to arrange the purchase of

---

[2] The CS has been vetted by BCSO TFO's and is currently cooperating for monetary compensation. The CS has a
criminal history consisting of the following:  Possession of controlled substance, shoplifting, resisting evading
obstructing, burglary, receiving/transferring stolen motor vehicle, possession of burglary tools, conspiracy to
commit a felony, aggravated burglary, aggravated assault on a peace officer, assault with a deadly weapon, robbery,
tampering with evidence, armed robbery, parole violation. These charges range from 1996 to 2018. The CS's
information has been proven to be reliable and has led to several arrests.

fentanyl pills and arranged the meet in the northeast part of Albuquerque. That same day, the CS traveled to the established meet location accompanied by UC-1 in the CS vehicle. The CS was searched, and no contraband was located. UC-1 was provided with a recording device and $250 of Official Advance Funds (OAF).

37.    UC-1 observed PARKER arrive to the meet location in a white Volkswagen Jetta bearing AZ plate CGE2893 ("the white Jetta").   PARKER exited the front passenger seat of the Jetta and entered the rear seat of the CS vehicle. PARKER handed UC-1 approximately 12.5 grams of fentanyl pills and UC-1 gave parker $250. A few minutes after entering the CS vehicle, PARKER returned to the Jetta and departed the area. The pills tested positive for the presence of fentanyl from a test kit and were subsequently sent to the Albuquerque Police Department Evidence for analysis.

38.    Agents maintained surveillance on the white Jetta and observed it arrive at 3409 Lafayette Drive NE, Albuquerque, New Mexico (TARGET LOCATION 2). Agents observed PARKER and the driver exit the vehicle and go inside apartment D, which is on the second floor on the north side. Agents identified the driver of the white Jetta to be Christopher RODRIGUEZ, a known fentanyl trafficker to DEA.

<u>Undercover Purchase #2 from PARKER</u>

39.    On or about March 2023, UC-1 contacted PARKER to arrange the purchase of fentanyl pills and arranged the meet in the northeast part of Albuquerque. That same day, UC-1 traveled to the established meet location in UC-1's vehicle. UC-1 was provided with a recording device and $2,000 of Official Advance Funds (OAF).

40.    Agents established surveillance at PARKER's residence located at 2346 Cardenas Drive NE, Albuquerque, New Mexico, and observed a white Kia Optima bearing NM

plate AYAW83 ("the white Kia")[3] depart the residence. Agents observed PARKER driving the white Kia.

41.    UC-1 observed PARKER arrive to the meet location in the white Kia. UC-1 exited UC-1's vehicle and got in the front passenger seat of the Kia. PARKER handed UC-1 approximately 165.3 gross grams of fentanyl pills and UC-1 gave PARKER $1,700. UC-1 exited the Kia and PARKER departed the area. These pills tested positive for the presence of fentanyl from a test kit and were subsequently sent to the DEA laboratory for analysis.

42.    Agents maintained surveillance on the white Kia and observed it arrive at 3409 Lafayette Drive NE, Albuquerque, New Mexico (TARGET LOCATION 2). Agents observed PARKER exit the vehicle and go inside apartment D, which is on the second floor on the north side.

43.    Minutes later PARKER exited the apartment and departed the area in the white Kia.

44.    Agents followed the white Kia and observed it arrive at an apartment complex located at 200 Figueroa Street NE, Albuquerque, New Mexico, and park on the north side of the apartment complex. A male wearing all black clothing came from one of the apartments and got in the front passenger side of the white Kia.  Shortly after, the male exited the vehicle and walked back to the apartment complex. The white Kia then departed the area. Agents identified this male as Christopher ROMERO[4] who is a known fentanyl trafficker to the DEA.

---

[3]  This white Kia Optima is registered to Jade Rose Brasher at 10472 Chandler Dr NW, Albuquerque, NM. Agents believe Brasher to be PARKER's girlfriend.

[4]  Christopher ROMERO is a known fentanyl dealer who operates in Albuquerque, NM. PARKER is believed to be ROMERO's Source of Supply (SOS).

45.     Agents ultimately followed PARKER back to his residence located at 2346 Cardenas Drive NE, Albuquerque, New Mexico.

Surveillance

46.     On March 2nd, 2023, Agents set up surveillance at PARKER's residence located at 2346 Cardenas Drive NE, Albuquerque, New Mexico. Agents observed a large U-Haul moving truck parked in the driveway along with a white Kia Optima bearing New Mexico License Plate: AYAW83. This Kia Optima was the same vehicle PARKER drove when he delivered 1,000 fentanyl pills to the UC on a previous occasion. Agents observed several individuals, to include PARKER, loading belongings from the residence into the U-Haul. Agents then observed all the individuals depart 2346 Cardenas Drive NE and followed the Kia and U-Haul to 212 San Lorenzo Avenue NW, Albuquerque, New Mexico. There, Agents observed the unknown individuals and PARKER unload items from the U-Haul.

47.     On days following the surveillance of March 2nd, Agents conducted surveillance at different times of the day of 2346 Cardenas Drive NE, Albuquerque, New Mexico, and it appeared the residence was vacant.

48.     During the next several days, Agents conducted surveillance at 212 San Lorenzo Avenue NW, Albuquerque, New Mexico, at different times of the day and observed the white Kia Optima bearing New Mexico License Plate: AYAW83, parked in the driveway. Agents also observed PARKER in the driveway on several occasions. At this point, Agents concluded that PARKER had moved to 212 San Lorenzo Avenue NW.

Undercover Purchase #3 from PARKER

49.     In March 2023, DEA UC-1 contacted PARKER to arrange the purchase of fentanyl pills and arranged the meet in the northeast part of Albuquerque.  That same day, the

UC-1 traveled to the established meet location in a UC vehicle.  UC-1 was provided with a recording device and $7,500 of Official Advance Funds (OAF).

50.     Agents established surveillance at PARKER's new residence located at 212 San Lorenzo Road NW, Albuquerque, New Mexico (TARGET LOCATION 1). Agents observed a female believed to be PARKER's girlfriend, Brasher, get inside the white Kia and depart the residence. Agents maintained surveillance on both the Kia and TARGET LOCATION 1. Agents followed the Kia and observed it park at No Bull Prime Meats located at 1208 Griegos Road NW, Albuquerque, New Mexico . Agents later observed PARKER depart TARGET LOCATION 1 wearing a white hoodie, jogger pants, carrying backpack and a skateboard. Agents followed PARKER to 1208 Griegos Road NW and observed PARKER go inside the meat market. Moments later, PARKER exited the meat market, place his belongings in the white Kia and depart the area in the Kia.

51.     Agents maintained surveillance on PARKER and observed him arrive at the AutoZone located at 3251 Coors Blvd SW. Agents observed a black Dodge sedan bearing New Mexico License Plate BDRW89 arrive and meet with PARKER. An unknown male wearing a red hoodie exited the front passenger side of the Dodge and got inside the front passenger seat of the Kia. Agents observed the male in the red hoodie exit the Kia two minutes later with his hand in the hoodie and get back in the Dodge and both vehicles departed the area. Based on my training and experience, this meet was consistent with drug trafficking activity.

52.     Agents followed PARKER and observed him arrive to the meet location in the white Kia. UC-1 exited the UC vehicle and got in the front passenger seat of the Kia. PARKER handed UC-1 approximately 625.5 gross grams of fentanyl pills and the UC gave parker $7,000. The UC exited the Kia and PARKER departed the area. The pills tested positive for the

presence of fentanyl from a test kit and were subsequently sent to the DEA laboratory for
analysis.

53.    Agents attempted to maintain surveillance on the Kia however, Agents lost
visual of the Kia due to PARKER's driving behavior.

Undercover Purchase #1 from RODRIGUEZ

54.    In March 2023, DEA UC-2 contacted RODRIGUEZ to arrange the purchase of
fentanyl pills and arranged the meet in the northeast part of Albuquerque.  That same day, UC-2
traveled to the established meet location in a UC vehicle.  UC-2 was provided with a recording
device and $1,500 of Official Advance Funds (OAF).

55.    Agents established surveillance at RODRIGUEZ residence located at 3409
Lafayette Drive NE, Albuquerque, New Mexico, and observed a white Volkswagen Jetta
bearing AZ plate CGE2893 ("the white Jetta")[5] depart the residence. Agents observed
RODRIGUEZ driving the Jetta.

56.    Surveillance units observed RODRIGUEZ arrive to the meet location in the
white Jetta. UC-2 exited the UC vehicle and got in the rear passenger seat of the Jetta.
RODRIGUEZ handed UC-2 approximately 168.6 gross grams of fentanyl pills and UC-2 gave
RODRIGUEZ $1,500. UC-2 exited the Jetta, and the white Jetta departed the area. The pills
tested positive for the presence of fentanyl from a test kit and were subsequently sent to the
DEA laboratory for analysis.

57.    Moments later, RODRIGUEZ exited TARGET LOCATION 2 and departed the
area in the Jetta. Agents observed RODRIGUEZ pick up a female at 344 Grove St SE and

---

[5] This white Kia Optima is registered to Jade Rose Brasher at 10472 Chandler Dr NW, Albuquerque, NM. Agents
believe Brasher to be PARKER's girlfriend.

depart the area. Surveillance was terminated as RODRIGUEZ continued traveling northbound I-25 towards Bernalillo.

### Undercover Purchase #2 from RODRIGUEZ

58.    In March 2023, UC-2 contacted RODRIGUEZ to arrange the purchase of fentanyl pills and arranged to meet in the northeast part of Albuquerque.  That same day, UC-2 traveled to the established meet location in a UC vehicle.  UC-2 was provided with a recording device and $1,500 of Official Advance Funds (OAF).

59.    Agents established surveillance at RODRIGUEZ' residence located at 3409 Lafayette Drive NE, Albuquerque, New Mexico.  However, RODRIGUEZ was not there.

60.    UC-2 observed RODRIGUEZ arrive to the meet location in the white Jetta. The UC-2 exited the UC vehicle and got in the rear passenger seat of the Jetta. RODRIGUEZ handed UC-2 approximately 167.4 gross grams of fentanyl pills and UC-2 gave RODRIGUEZ $1,500. UC-2 exited the Jetta, and the Jetta departed the area. The pills tested positive for the presence of fentanyl from a test kit and were subsequently sent to the DEA laboratory for analysis.

61.    Agents maintained surveillance on the white Jetta and observed it arrive at 3409 Lafayette Drive NE, Albuquerque, New Mexico (TARGET LOCATION 2). Agents observed RODRIGUEZ exit the vehicle and go inside apartment D, which is on the second floor on the north side.

### LAFAYETTE SURVEILLANCE

62.    Since the arrest of RODRIGUEZ, Agents set up surveillance at 3409 Lafayette Drive NE on March 18, 2023, at approximately 12:28 AM. Agents observed a tall Hispanic male exit apartment D and get inside a black Cadillac bearing New Mexico license plate:

BKGF51[6]. Agents identified this male to be Alejandro BARTON[7]. Agents followed the black Cadillac to the Maverik gas station located at 3737 Princeton Drive NE and observed it park to a grey Honda sedan. The unknown Hispanic male exited the Grey Honda and got in the rear seat of the Cadillac. After a short amount of time, the unknown male exited the Cadillac and departed the area in the grey Honda. Agents maintained surveillance on the Cadillac and followed it back to 3409 Lafayette Drive NE. Agents observed BARTON go back inside apartment D and close the door. Based on my training and experience, this activity is consistent with drug trafficking activity.

## CONCLUSION

63.     As described herein, Agents have conducted surveillance pre and post UC purchases and have observed PARKER come and go from TARGET LOCATION 1. Also, based on the intelligence gathered during multiple surveillances conducted at TARGET LOCATION 1 at different times of day lead Agents to believe TARGET LOCATION 1 is PARKER's residence Based on the foregoing information, there is probable cause that PARKER is involved in illegal trafficking of controlled substances and that he resides at TARGET LOCATION 1.

64.     As described herein, Agents have conducted surveillance pre and post UC purchases and have observed RODRIGUEZ frequent TARGET LOCATION 2 on multiple occasions. Based on surveillance conducted by Agents at different times of day to include late hours of the night, Agents believe RODRIGUEZ resides at TARGET LOCATION 2. Since the

---

[6] This black Cadillac sedan is registered to Alejandro BARTON 5025 Eakes Road NW, Albuquerque, NM.

[7] Alejandro BARTON is a known fentanyl dealer who operates in Albuquerque, NM. BARTON is an active DEA target of investigation.

arrest of RODRIGUEZ, Agents have conducted surveillance at TARGET LOCATION 2 and have observed other known drug traffickers still operating out of TARGET LOCATION 2. Based on Agents observations, it is believed TARGET LOCATION 2 is still an active stash house.

65.     I submit that this affidavit supports probable cause for a warrant to search PARKER's and RODRIGUEZ's residences, the premises described in Attachments A-1 and A-2, and seize the items described in Attachment B.

Respectfully submitted,

Erick D. Castañeda
Task Force Officer
Drug Enforcement Administration

Electronically signed and telephonically sworn
on March 20, 2023:

THE HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-2

*Property to be searched*

The property to be searched is 3409 LAFAYETTE DR NW, APT-D, ALBUQUERQUE, NEW MEXICO 87107 ("TARGET LOCATION 2"), further described as A two story 4-plex apartment building. The complex is brown in color with pink trim underneath the windows. The complex is a brown shingles pitched roof.  TARGET LOCATION 2, is on the second floor on the north side of the staircase. TARGET LOCATION 2 has the letter "D" affixed to front door. A photograph of the TARGET LOCATION 2 is included below:



The search of the above TARGET LOCATION 2 shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes

and trash cans) on the TARGET LOCATION 2, and all persons located in TARGET

LOCATION 2 in or on which the items to be seized could be concealed.  The search shall also

include all vehicles parked at, or in front of, TARGET LOCATION 2 that have an apparent

connection to TARGET LOCATION 2 and/or the residents of TARGET LOCATION 2.

Connection to the vehicle may be established by evidence that anyone residing at TARGET

LOCATION 2 own, operate, and/or have access to any vehicle parked at or in front of TARGET

LOCATION 2. Evidence includes prior law enforcement observation, vehicle registration,

subject admission, or possession of an ignition key.

**ATTACHMENT B**

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841 and 846, those violations involving Raymond PARKER, including:

1.  Controlled substances, including fentanyl, methamphetamine, heroin, cocaine, and marijuana.

2.  Drug paraphernalia, including scales, packaging materials, items for packaging and handling drugs.

3.  Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4.  Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5.  Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6.  Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7.  Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.  Indications of ownership or control of said TARGET LOCATION 2 and/or other TARGET LOCATION 2 used in unlawful drug trafficking activity, including utility bills, cancelled checks, or envelopes and deeds or leases.

9.  Indications of ownership or control over any vehicles located at the place to be searched, including titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.